IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| BRIANNA WELTHER, *on behalf of* J.D.R., <br><br> Plaintiff, <br><br> vs. <br><br> COMMISSIONER OF SOCIAL SECURITY, <br><br> Defendant. | CASE NO. 1:25-CV-01265-JRA <br><br> JUDGE JOHN R. ADAMS <br><br> MAGISTRATE JUDGE DARRELL A. CLAY <br><br> **REPORT AND RECOMMENDATION** |

INTRODUCTION

Plaintiff Brianna Welther, on behalf of minor child J.D.R., challenges the Commissioner of Social Security's decision denying J.D.R. supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of June 17, 2025). For the reasons below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the matter for additional proceedings.

PROCEDURAL BACKGROUND

Ms. Welther applied for SSI on J.D.R.'s behalf on August 23, 2022, alleging J.D.R. became disabled as of July 27, 2019, due to the following:

> [J.D.R.] has ADHD and autism. He struggles with staying focused on his daily tasks of getting himself ready for the day or showering himself. He doesn't adjust well to change in routine. He is defiant and distracted when asked to do things. His moods are constantly negative even when he is told he gets to do something fun. He throws tantrums when he doesn't want to do something where he'll throw his toys creating

1

a mess or try to break his belongings or other things in the house. He mocks and talks back to us.

(Tr. 59, 197-98). After the claim was denied initially and on reconsideration, Ms. Welther requested a hearing before an administrative law judge. (Tr. 50-64, 94-96). On February 1, 2024, Ms. Welther (represented by counsel) appeared before the ALJ. (Tr. 33-49). On June 5, 2024, the ALJ determined J.D.R. was not disabled. (Tr. 14-32). On May 2, 2025, the Appeals Council denied Ms. Welther's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. § 416.1481). Ms. Welther timely filed this action on June 17, 2025. (ECF #1).

FACTUAL BACKGROUND

I.      **Personal and Vocational Evidence**

J.D.R. was 8 years old on the application date and 9 years old at the time of the hearing. (*See* Tr. 50, 36). As of the hearing, he was in third grade. (Tr. 42).

II.      **Relevant Treatment and Education Evidence**

In August 2020, pediatric psychologist David L. Chiarella, Ph.D., evaluated J.D.R. who was then 6 years old. (Tr. 295). Dr. Chiarella's evaluation included interviewing Ms. Welther and J.D.R. and reviewing a Teacher Questionnaire from J.D.R.'s most recent teacher.

Ms. Welther explained J.D.R. can listen, follow directions, and focus, but was restless, hyperactive, and had significant tantrums. (*Id.*). She reported J.D.R. had difficulty sitting still and paying attention in the classroom but did not fight with other students and was not oppositional or defiant. (*Id.*). She reported J.D.R. would repeat kindergarten because his academic skills were below expectation for his age and grade level. (*Id.*). J.D.R. took medication but was "still out of

2

focus" and "still ha[d] trouble sitting in place." (Tr. 296). Ms. Welther noted J.D.R. liked toys, video games, and playing outside, "particularly sports." (*Id.*).

After interviewing J.D.R., Dr. Chiarella noted he was "cooperative and compliant," responded to questions and requests, and maintained eye contact. (*Id.*). J.D.R. recalled "three objects immediately and again after a delay," "completed a three-stage command," and identified similarities between words and objects, but could not define common words. (*Id.*). Dr. Chiarella also reviewed a Teacher Questionnaire indicating J.D.R. had difficulty completing tasks independently, needed constant redirection to stay at pace with the class, and had difficulty following classroom rules. (Tr. 295). Dr. Chiarella then gave opinions concerning J.D.R.'s functional abilities and limitations, described in Section IV below. (Tr. 297-98).

In December 2021 and February 2022, April Topfer, Ph.D., evaluated J.D.R. for autism spectrum disorder (ASD). (Tr. 317). During the evaluation, Ms. Welther reported concerns in specific areas including delays in social and play skills, repetitive behaviors, sensory seeking and avoidance behaviors, delays in adaptive language, displays of hyperactivity/impulsivity and attention/concentration/focus, and disruptive behaviors. (Tr. 319-20). J.D.R. described feeling angry with others when he was told "no" or when he was prompted to do something, like chores, and appeared negative towards his mother during the interview. (Tr. 320). Dr. Topfer noted J.D.R. mumbled to himself during the assessment and, at times, responded to questions with information that was "out-of-context." (Tr. 318). For instance, when Dr. Topfer asked J.D.R. about his friendships, he responded he was in Room 5 in kindergarten and now in Room 7. (*Id.*). Dr. Topfer also reviewed a teacher's report observing that J.D.R. "seems very distracted and off task. He takes a long time to process information. He blurts out and doesn't take his time or do his best work," is

capable of more but "is slow to get his work done," and "always seems a few steps behind his peers. He needs many reminders and redirects." (Tr. 318).

As part of the evaluation, Dr. Topfer administered a series of tests. (Tr. 317). She noted J.D.R. initially appeared to "think through the given problems" but became continually distracted as testing progressed. (Tr. 320). J.D.R.'s score on the Autism Diagnostic Observation Schedule, 2nd Edition, was consistent with ASD. (Tr. 321). The Childhood Autism Rating Scale, 2nd Edition, indicated severe symptoms associated with ASD. (Tr. 322). The Social Responsiveness Scale, a test measuring the severity of social impairment associated with ASDs, indicated mild-to-moderate severity. (*Id.*). The Child Behavior Checklist (completed by Ms. Welther) and the Teacher's Report Checklist, used to assess behavioral problems, were remarkable for clinically significant issues including depression and withdrawal, attention problems, affective problems, attention deficit/hyperactivity problems, oppositional defiant problems, and conduct problems. (Tr. 322-23). IQ testing revealed a standard score of 79, placing J.D.R. in the borderline range between low average intelligence and mild impairment. (Tr. 323). The Clinical Evaluation of Language Fundamentals, 4th Edition, designed to evaluate language and communication skills, indicated borderline functioning for receptive and expressive language. (Tr. 324).

After interviewing Ms. Welther, evaluating, observing, and interacting with J.D.R., and reviewing the test results, Dr. Topfer concluded J.D.R.'s symptoms were "consistent with autism with clear evidence of clinically significant impairment" and diagnosed ASD, Level 1, with accompanying language impairment and borderline intellectual disability. (Tr. 325).

Seeking additional support to address J.D.R.'s behavior, in March 2022 Ms. Welther and J.D.R. attended a diagnostic intake assessment for behavioral therapy and community support

4

services through The Counseling Center. During the assessment, Ms. Welther reported J.D.R. struggled with toileting issues—encopresis and enuresis—at home and school, did not acknowledge other's feelings or recognize other's emotions, showed little emotional expression, fixated on video games, did not sit still, acted impulsively, distracted classmates, and needed frequent redirection.[1] (Tr. 349). J.D.R. was restless during the session, fidgeted and got out of his seat. (Tr. 352). The evaluator noted constricted affect, poor self-control/impulsivity, restlessness, distractibility, and poor concentration. (Tr. 357-58). In terms of observed behavior, the evaluator described J.D.R. as defiant or uncooperative, argumentative, and destructive to property. (Tr. 358). The evaluator recommended community psychiatric support and treatment (CPST). (Tr. 353).

In June, J.D.R.'s assigned community support provider, a clinical social worker (CSW), met with J.D.R. and Ms. Welther at their home and prepared a treatment plan addressing three issues: (1) J.D.R.'s negativity towards new foods and trying new things, (2) his attention and concentration deficits, and (3) his struggles with toileting, including holding urine or stool for so long that he has accidents. (Tr. 362-63). The CSW recommended monthly participation in CPST and therapeutic behavior health services (TBS), or more often as needed. (*Id.*).

During a well-child visit with pediatrician Richelle Keleman, M.D., in July 2022, the doctor noted J.D.R. spun around in circles throughout the appointment. (Tr. 534).

---

[1] Encopresis is "the involuntary passing of stool into inappropriate places such as the underwear of children older than four years of age." *Encopresis, National Library of Medicine,* http://www.ncbi.nlm.nih.gov/books/NBK560560/ (last accessed May 18, 2026). Diurnal enuresis is daytime wetting that occurs in children old enough to control their bladder. *Urinary Incontinence in Children, Johns Hopkins Medicine,* http://www.hopkinsmedicine.org/health/conditions-and-diseases/urinary-incontinence/urinary-incontinence-in-children (last accessed May 18, 2026).

When the CSW met with J.D.R. and his mother at their home in August 2022, J.D.R. was in the middle of a "shut down moment" and refused to speak to or look at his mom or the CSW. (Tr. 380). He "finally calmed down" halfway through the meeting and joined their conversation. (*Id.*).

In addition to home visits, the CSW met with J.D.R. at his school to aid improvement in social skills and daily functioning. The CSW's service notes show she attended J.D.R.'s school six times between September and November 2022 where the CSW engaged J.D.R. in age-appropriate evidence-based activities and games to improve his focus, flexible thinking, executive function, and awareness of rules. (Tr. 382, 384, 386, 388, 390, 392). Twice the CSW observed J.D.R. waited too long to go to the bathroom because he was absorbed in his current activity and almost wet his pants. (Tr. 382, 390). On one occasion, J.D.R. got in trouble for playing with his watch and distracting others in class after the CSW left for the day. (Tr. 388). While playing skill-building games, J.D.R. required several reminders to follow the rules and not skip over the CSW's turn. (Tr. 390). When updating J.D.R.'s treatment plan in November, the CSW noted J.D.R. was doing better with some goals but still needed a lot of improvement. (Tr. 392).

Dr. Chiarella re-evaluated J.D.R. in November 2022, during which Ms. Welther indicated he was still hyper but now he "can't stay focused," "doesn't sit still," and "doesn't follow directions." (Tr. 332). She reported he talked back, hit his siblings, and threatened to destroy things at home but did not demonstrate similar behavior problems at school. (*Id.*). Dr. Chiarella observed that J.D.R.'s concentration and attention were sufficient during the interview, he was engaged and able to follow the flow of conversation, and he was restless but not hyperactive. (Tr. 333). Dr. Chiarella diagnosed ADHD and an "unspecified disruptive behavior disorder

6

(oppositional and defiant behaviors)" and offered opinions concerning J.D.R.'s functional abilities and limitations, described in Section IV below. (Tr. 334-35).

The CSW continued to meet with J.D.R. at his school in January, February, and March 2023. (Tr. 394, 396, 445, 443, 441) (chronological order). In January, the CSW noted J.D.R. claimed to be eating better and not arguing with his mother as often. (Tr. 394). Ms. Welther reported he regularly threw "fits" (Tr. 396) and, in March, J.D.R. started threatening to kill his sister and himself. (Tr. 443). When the CSW spoke to J.D.R. about his tantrums, he said he only had them when he played video games (Tr. 396). As to the threats, J.D.R. said that was just how he reacted when he gets angry (Tr. 441). These conversations led to discussions about different ways for J.D.R. to address and control his anger. (Tr. 441, 445).

From March 2023 to March 2024, J.D.R. attended weekly telehealth therapy sessions with a licensed professional counselor to "develop better self-management skills" and "prioritize his responsibilities" to struggle less with performing tasks. (Tr. 476-522, 566-641). On assessment, J.D.R. reported he sometimes struggles to get along with family members, is easily distracted, and sometimes gets tired. (Tr. 520). At every session, the counselor recorded the following mental status examination findings:

**Current Mental Status**

| | |
|---|---|
| Orientation: | X3: Oriented to Person, Place, and Time |
| General Appearance: | Appropriate |
| Dress: | Appropriate |
| Motor Activity: | Unremarkable |
| Interview Behavior: | Appropriate |
| Speech: | Normal |
| Mood: | Euthymic |
| Affect: | Congruent |
| Insight: | Fair |
| Judgment/Impulse Control: | Fair |
| Memory: | Intact |
| Attention/Concentration: | Good |
| Thought Process: | Unremarkable |
| Thought Content: | Appropriate |
| Perception: | Unremarkable |
| Functional Status: | Intact |

(Tr. 476-522, 566-641).

In June 2023, J.D.R. was reassessed for continued CPST and TBS services. (Tr. 419). Ms. Welther reported continued issues with focusing and staying on task as well as bedwetting, daytime enuresis, and encopresis but at a lesser frequency. (Tr. 422). During the assessment, J.D.R. displayed a flat and constricted affect, had poor self-control/impulsivity, was overactive, and showed poor focus and concentration. (Tr. 427-28).

In July 2023, at a well-child visit with Dr. Keleman, Ms. Welther reported J.D.R. does his homework but cannot complete his work at the same pace as his peers. (Tr. 525). Ms. Welther also reported continued daytime urination accidents but fewer accidental bowel movements. (*Id.*).

That month, Ms. Welther told the TBS provider that J.D.R. struggled to stay focused and was uninterested in anything but playing with electronics. (Tr. 417). The TBS provider noted J.D.R. needed several prompts to stay engaged in a skill-building activity that day. (*Id.*).

In August 2023, J.D.R. began an occupational therapy program aimed at improving sensory processing and activities-of-daily-living skills. (Tr. 455). During the first evaluation, the therapist administered the Beery Visual-Motor Integration (VMI) test (copying geometric forms

with pencil and paper) to assess hand-eye coordination and the Sensory Processing Measure (SPM) to assess for sensory processing issues, praxis, and social participation. (Tr. 456). The Beery VMI test results placed J.D.R.'s visual perception at average, motor coordination at "very low," and hand-eye coordination at below average. (*Id.*). The SPM revealed "some problems" in social participation, touch, body awareness, balance and motion, and planning and ideas. (*Id.*).

In the evaluation, Ms. Welther described J.D.R.'s activities of daily living as follows:

- **Feeding**: He independently eats with utensils but has a limited diet.

- **Grooming**: He dislikes having his hair brushed or his nails trimmed, demonstrates impaired thoroughness when completing grooming activities, and needs more time and prompting from his mother to complete grooming activities.

- **Dressing**: He can dress himself but needs more time without help.

- **Toileting**: He was toilet-trained before kindergarten but has since developed difficulties. He has daily urination accidents and occasional bowel movement accidents. His mother explained his accidents appear to happen because he does not want to stop what he is doing or playing. J.D.R. said he sometimes does not notice when he has an accident.

- **Simple ADL Fasteners**: J.D.R. can zip coats and button some buttons but cannot tie his shoes.

(Tr. 457). The examiner's clinical observations revealed impaired motor planning while using scissors (multiple starting/exiting points, turned the paper illogically) and impaired midline crossing (frequently moved his body or the paper to avoid crossing the midline of his body). (Tr. 458-59). The examiner concluded J.D.R. has impairments with age-appropriate visual-motor skills, bilateral integration, sensory regulation, gross motor coordination, and fine motor coordination, "impacting his ability to perform functional activities independently across all environments." (Tr.

9

459). She recommended a one-year course of occupational therapy, one-to-two sessions per week for 30-60 minutes per session. (*Id.*).

In September 2023, J.D.R. was suspended from school for one day for throwing crayons on the bus. (Tr. 406).

In November 2023, Ms. Welther reported J.D.R. had a single urinary accident in the past month. (Tr. 449).

Early the next year at a medication management appointment, Ms. Welther reported J.D.R. had difficulty paying attention, following through with instructions, and organizing; made careless mistakes; avoided tasks that require mental effort; was easily distracted and forgetful; and fidgeted in his seat. (Tr. 465). She also reported he was abnormally shy, easily annoyed by others, and had daytime urination accidents. (*Id.*). The provider renewed his prescriptions for Seroquel and Vyvanse. (Tr. 474).

At the end of January 2024, Ms. Welther took J.D.R. to the emergency department for abdominal pain, a sore throat, a headache, and fatigue. (Tr. 553). He was diagnosed with acute sore throat. (Tr. 554). They returned to the emergency department the next day for constipation. (Tr. 560). An abdominal x-ray revealed a non-obstructive gas pattern with a large stool burden. (Tr. 561). After some time and encouragement from the nursing staff, J.D.R. had a bowel movement on his own. (*Id.*).

## III.    Teacher Questionnaire

In September 2022, J.D.R.'s teacher Joni Campbell completed a Teacher Questionnaire about his overall functioning in six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating

10

objects, (5) caring for himself, and (6) physical well-being. (Tr. 307-14). In acquiring and using information, Ms. Campbell indicated J.D.R. had an obvious problem comprehending oral instructions and slight problems in nine other areas:

1. Understanding school and content vocabulary;
2. Reading and comprehending written material;
3. Comprehending and doing math problems;
4. Understanding and participating in class discussions;
5. Providing organized oral explanations and adequate descriptions;
6. Expressing ideas in written form;
7. Learning new material;
8. Recalling and applying previously learned material; and,
9. Applying problem-solving skills in class discussions.

(Tr. 313).

In attending and completing tasks, Ms. Campbell noted obvious problems in refocusing to task when necessary, changing from one activity to another without being disruptive, completing class and homework assignments, and working without distracting himself or others. (Tr. 310). She also observed slight problems in six other areas:

1. Paying attention when spoken to directly;
2. Focusing long enough to finish assigned activity or task;
3. Carrying out single-step and multi-step instructions;
4. Organizing his own things or school materials;
5. Completing work accurately without careless mistakes; and,
6. Working at a reasonable pace and finishing on time.

(*Id.*).

In interacting and relating with others, Ms. Campbell indicated J.D.R. had slight problems in seven areas:

1. Following rules (classroom, games, sports);
2. Respecting/obeying adults in authority;
3. Relating experiences and telling stories;
4. Introducing and maintaining relevant and appropriate topics of conversation;

11

5.      Taking turns in a conversation;

6.      Interpreting the meaning of facial expressions, body language, hints, and sarcasm; and,

7.      Using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation.

(Tr. 311). Ms. Campbell did not identify issues in the other three functional domains. (*See* Tr. 308-10).

## IV.    Medical Opinions and Prior Administrative Findings

Dr. Chiarella evaluated J.D.R. in September 2020 and November 2022. (Tr. 295, 332). In 2020, Dr. Chiarella offered the following functional assessment:

**Describe the claimant's abilities and limitations in acquiring and using information relative to the functioning of typically developing children of the same age.**

[J.D.R.'s] ability to acquire, use and retain general information does not appear to be developed at a level that is consistent with his age expectations. He is repeating kindergarten. [J.D.R.] demonstrated difficulty on the Mental State examinations. For instance, he was unable to define common words. He was unable to state similarities between objects. He was unable to state today's day or date. Although his cognitive and academic skills were not formally assessed, it is unlikely that he is demonstrating skills and abilities within normal parameters.

**Describe the claimant's abilities and limitations in attending to and completing tasks relative to the functioning of typically developing children of the same age.**

Overall, [J.D.R.] was able to attend and concentrate during the interview session. He was able to respond to the examiner's questions and requests. He was able to sustain a conversation with the examiner. Yet, his physical activity increased as the session progressed. He became more restless; yet, he did not move out of his chair. His mother reported that he demonstrates significant problems with attention, concentration and he is hyperactive.

**Describe the claimant's abilities and limitations in interacting and relating to others relative to the functioning of typically developing children of the same age.**

[J.D.R.] has demonstrated the ability to initiate and maintain age-appropriate relationships. He has not demonstrated a history of verbal or physical aggression with

12

others. He has not demonstrated a history of oppositional or defiant behaviors with adults in authority.

**Describe the claimant's abilities and limitations in self-care relative to the functioning of typically developing children of the same age.**

Overall, [J.D.R.] does perform most self-care activities at an age-appropriate level. His mother reported that he continues to require assistance to dress himself as well as wash and bath himself.

(Tr. 297-98).

In 2022, Dr. Chiarella's assessment changed:

**Describe the claimant's abilities and limitations in acquiring and using information relative to the functioning of typically developing children of the same age.**

[J.D.R.'s] ability to acquire, use and retain general information appears to be developed within normal parameters. His responses to the Mental Status Examination questions were age-appropriate, especially his verbal comprehension skills. He was retained in kindergarten. His mother reported he excels in math. He does not receive special education services or other learning support.

**Describe the claimant's abilities and limitations in attending to and completing tasks relative to the functioning of typically developing children of the same age.**

[J.D.R.] has a history of attention deficits and hyperactivity. He is currently treated with medication. During the interview session, he was able to attend, concentrate and persist in goal directed activity. He was not distracted. He was somewhat restless but not hyperactive.

**Describe the claimant's abilities and limitations in interacting and relating to others relative to the functioning of typically developing children of the same age.**

During the interview, [J.D.R.] was socially appropriate. He responded to the examiner's questions. He demonstrated age-appropriate communication and social reciprocity skills. [J.D.R.] continues to demonstrate oppositional and defiant behaviors at home. He is physically aggressive with his siblings. He does not demonstrate these behaviors at school.

**Describe the claimant's abilities and limitations in self-care relative to the functioning of typically developing children of the same age.**

[J.D.R.] does not perform self-care activities at an age-appropriate level across the dressing, bathing, and grooming areas.

(Tr. 334-35).

During initial review in December 2022, state agency consultant Cindy Matyi, Ph.D., opined J.D.R. had a less than marked limitation in four of the six functional domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, and (4) caring for himself. (Tr. 53-54). Dr. Matyi opined J.D.R. had no limitation in the two domains of moving about and manipulating objects and health and physical well-being. (Tr. 54).

On reconsideration in March 2023, state agency consultant Gail Goldberg, Ph.D., agreed with Dr. Matyi's assessment. (Tr. 61-62).

## V.   Functional Reports and Relevant Testimonial Evidence

As part of the SSI application, Ms. Welther completed a Child Function Report detailing how J.D.R.'s conditions affect how he performs his usual activities. (Tr. 229-38). She conveyed J.D.R. cannot tie shoelaces and did not pick up and put away toys, help around the house, or do what he is told most of the time. (Tr. 236). In terms of focus and attention, she reported J.D.R. cannot keep busy on his own, finish the things he starts, or complete chores. (Tr. 237).

The administrative hearing was held by telephone, during which Ms. Welther stated J.D.R. could not testify because they were at the emergency department in an area that did not have good reception while J.D.R. was being treated for constipation. (Tr. 35). She described J.D.R.'s struggles with toileting habits ("he holds"; "he has accidents") and explained he spent the prior night "screaming and crying" from stomach pain. (Tr. 40).

14

Ms. Welther then testified how J.D.R.'s conditions affect his ability to function. J.D.R. seldom gets in trouble at school but Ms. Welther reported his teachers have described him as restless, unfocused, and a distraction to the class. (Tr. 43). J.D.R. participates in occupational therapy for cognitive and toileting issues, focus, attention span, and physical posture. (Tr. 45-46). He is still learning to tie his shoes. (Tr. 45). He struggles to sit still ("paces"; "spins in circles") and "gets lost in his head." (Tr. 47).

At home, J.D.R. struggles to follow rules and be responsible for himself. (Tr. 44) ("If I ask him to do something he doesn't want to do, it becomes a huge problem."). He can help do simple chores, but it might take "all day just to get him to do it," or he does not do it correctly. (Tr. 47). He cannot shower without supervision because he either just stands there or does not wash himself effectively. (Tr. 44). J.D.R. has weekly daytime urination accidents and occasional bowel accidents but he had fewer accidents in the months before the hearing (Tr. 45, 48). Ms. Welther said J.D.R. is also physically aggressive towards her and others. (Tr. 46). He lives with his mother, two siblings, and another unrelated family of three. (Tr. 41). He is "always fighting" with the other family's 3-year-old child. (Tr. 46) ("bickering"; "smacking each other"; "pulling each other's hair"). He also fights with his sister, talks back to his mom, and says hurtful things. (*Id.*). J.D.R. gets along with his 1-year-old brother because "his brother is the one that's not doing much to him or taking his stuff." (*Id.*).

### STANDARD FOR CHILDHOOD DISABILITY

Eligibility for benefits turns on the existence of a disability. 42 U.S.C. § 423(a). A child is considered disabled if he has "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be

15

expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906.

For claimants under the age of 18, the Commissioner follows a three-step evaluation process—found at 20 C.F.R. § 416.924(a)—to determine whether a claimant is disabled:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled regardless of their medical conditions. If not, the analysis proceeds.

2. Does claimant have a medically determinable, severe impairment, or a combination of impairments, that is severe? For an individual under age 18, an impairment is not severe if it causes a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3. Does the severe impairment meet, medically equally, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

The sole disputed issue here is Step Three: whether the child's impairment or combination of impairments functionally equals a listed impairment. To make that determination, the child's functioning is assessed in six functional domains:

1. Acquiring and using information;
2. Attending and completing tasks;
3. Interacting and relating with others;
4. Moving about and manipulating objects;
5. Caring for yourself; and
6. Health and physical well-being.

16

20 C.F.R. § 416.926a(b)(1). If the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain, then the impairment is of listing-level severity and therefore functionally equal to the listings.[2] *Id.* § 416.926a(a).

Taken in isolation, no single piece of information establishes whether a child has a marked or extreme limitation; therefore, test scores are considered together with other available information about the child's functioning. *Id.* § 416.926a(e)(4). Adjudicators must assess the interactive and cumulative effects of all impairments and consider the relevant factors affecting a child's functional limitations, including how well the child initiates and sustains activities, how much extra help the child needs, the effects of structured or supportive settings, and how medication or other treatment affects the child. *Id.* § 416.926a(a)(1)-(3).

### THE ALJ'S DECISION

At Step One, the ALJ found J.D.R. had not engaged in substantial gainful activity. (Tr. 18). At Step Two, the ALJ determined J.D.R. has four severe impairments: autism, ADHD, oppositional defiant disorder (ODD), and enuresis/encopresis. (*Id.*). At Step Three, the ALJ found J.D.R.'s impairments did not meet, medically equal, or functionally equal the severity of a listed impairment. (Tr. 18, 20). The ALJ found J.D.R. had:

- <u>less than a marked</u> limitation in acquiring and using information;

---

[2]    A *marked* limitation seriously interferes with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). It is a more than moderate, but less than extreme, limitation. *Id.* It is the equivalent of the functioning one would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.*

An *extreme* limitation is one very seriously interferes with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i). An extreme limitation is more than marked but does not necessarily mean a total lack or loss of ability to function. *Id.* It is the equivalent of functioning one would expect to find on standardized testing with scores that are at least three standard deviations below the mean. *Id.*

- <u>less than a marked</u> limitation in attending and completing tasks;
- <u>less than a marked</u> limitation in interacting and relating with others;
- <u>less than a marked</u> limitation in moving about and manipulating objects;
- <u>less than a marked</u> limitation in the ability to care for himself; and
- <u>no</u> limitation in health and physical well-being.

(Tr. 20). Thus, the ALJ concluded J.D.R. was not disabled. (Tr. 28).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions" unless the Commissioner "made findings of fact unsupported by substantial evidence in the record" or "failed to apply the correct legal standards." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

"Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings are conclusive "as to any fact if supported by substantial evidence . . . ." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). But a substantiality of evidence evaluation does not permit a selective reading of the record. "Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if

substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

But a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

## DISCUSSION

Ms. Welther contends the ALJ erred in evaluating Ms. Welther's statements about the intensity, persistence, and limiting effects of J.D.R.'s symptoms in the domains of attending and completing tasks and caring for oneself because "any reasoning the ALJ provided to reject [her] statements regarding [J.D.R.'s] functioning is very minimal" and therefore substantial evidence

19

does not support the functional equivalency evaluation. (ECF #10 at PageID 688-89). Ms. Welther also takes issue with the ALJ's conclusion that J.D.R. can do homework and points to her statement that J.D.R. cannot complete his work at the same pace as other children. (*Id.* at PageID 691). Nested within this claim is Ms. Welther's second argument that the ALJ cherry-picked the evidence to support her findings and therefore the decision lacks substantial evidence. (*Id.* at PageID 690). If the ALJ concluded J.D.R. has marked limitations in both domains, J.D.R.'s conditions would functionally equal the Listings and thus entitle him to finding of disability. For clarity, I address Ms. Welther's cherry-picking argument first.

## I.  Functional Equivalence and the "Whole Child" Approach

In determining functional equivalence, the ALJ takes account of the "whole child." Social Security Ruling (SSR) 09-1p, 2009 WL 396031, at *2 (Feb. 7, 2009). To begin, the ALJ considers and makes factual findings about how the child functions every day in all settings compared to other children who do not have impairments.  20 C.F.R. § 416.926a(b). More specifically, the ALJ considers the following:

1.  What activities the child can and cannot perform;

2.  Which activities are limited or restricted;

3.  Where the child has difficulty with activities (at home, in childcare, at school, or in the community);

4.  Whether the child has difficulty independently initiating, sustaining, or completing activities;

5.  The type and amount of help the child needs to do activities, and how often the child needs it; and

6.  Whether the child needs a structured or supportive setting, what type of structure or support the child needs, and how often the child needs it.

*Id.* § 416.926a(b)(2). The ALJ need not answer these specific questions in the decision but "the evidence should create a clear picture of the child's functioning in the context of the six . . . domains." SSR 09-2p, 2009 WL 396032, at *2 (Feb. 18, 2009). Next, the ALJ determines what domains are involved in those activities and whether the child's impairments could affect those domains and account for the limitations. SSR 09-1p at *2. The ALJ then rates the severity of the limitations in each affected domain. 20 C.F.R. § 416.926a(d). To rate severity, the ALJ must "determine the extent to which an impairment(s) compromises a child's ability to independently initiate, sustain, and complete activities" by considering "the kinds of help or support the child needs in order to function." SSR 09-1p at *6. Generally, a child will not be as independent as peers who do not have impairments if the child needs a person, medication, treatment, device, or structured/supportive setting to improve or make functioning possible. *Id.* The ALJ then determines if the child has marked or extreme limitations based on the answers to the following questions:

1.  How many of the child's activities in the domain are limited (one, few, several, many, or all)?

2.  How important are the limited activities to the child's age-appropriate functioning (basic, marginally important, or essential)?

3.  How frequently do the activities occur and how frequently are they limited (daily, once a week, or only occasionally)?

4.  Where do the limitations occur (at home, at school, in the community, in all settings)?

5.  What factors are involved in the limited activities (does the child receive support from a person, medication, treatment, device, or structured/supportive setting)?

*Id.* at *9.

21

Before addressing Ms. Welther's asserted errors, I note the ALJ's decision is less comprehensive than the assessment envisioned in the regulations and guiding SSRs. The ALJ did not provide a longitudinal assessment of the evidence setting forth the activities J.D.R. can and cannot perform relative to his same-aged peers or discuss the degree and frequency of help he needs to do them. Before assessing the severity of J.D.R.'s limitations in the individual domains, the ALJ summarized the record as follows:

> The claimant is a 9-year-old boy alleging disability due to autism and ADHD. In his Function Report – Child, the claimant's mother indicated that the claimant's conditions affect his ability to help himself and cooperate with others in taking care of his personal needs and pay attention and stick with a task.
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the allegations concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record.
>
> The record shows that the claimant has been diagnosed with ADHD and autism. He receives counseling on a monthly basis. He works on focus through skill building activities. He is also prescribed Vyvanse and Seroquel. He has done well on the medications. More specifically, he sleeps better and is more focused on medication. In addition, as part of his treatment, examiners have recommended he frequently be put in situations to elicit interactions with peers.
>
> The record further reveals the clamant has encopresis / enuresis. The claimant frequently urinates during the day. Consistent with the diagnoses he has a noted history of accidents. The claimant's mother testified that he has pee accidents a few times a week. The record shows he has 1 accident a week. Interestingly, he has no accidents at night. In fact, the record reveals his accidents occur when he is absorbed in what he is doing. He told examiners he has accidents when he does not want to stop whatever he is doing to go to the restroom.

(Tr. 21). In assessing the severity of J.D.R.'s limitations in the individual domains, the ALJ plucked various pieces of evidence from the record and stated the evidence supported less than marked limitations but did not articulate why the ALJ credited that evidence over what appears to be

relevant and probative evidence of greater limitation not mentioned or assessed. As discussed in more detail below, the ALJ need not address every piece of evidence in the record and the failure to mention specific evidence does not necessarily indicate the evidence was not considered, but the ALJ may not ignore an entire line of relevant evidence that is contrary to the ruling or undermines the ALJ's conclusions.

> **A.** **The ALJ selectively parsed the record and did not address evidence suggesting greater limitation such that the Court cannot determine if substantial evidence supports the decision.**

Ms. Welther argues the ALJ selectively parsed the record when assessing J.D.R.'s abilities in two functional domains. The ALJ must consider all relevant evidence in the record when determining whether the claimant is disabled. 20 C.F.R. § 416.924(a). But the ALJ need not directly address in the written decision every piece of evidence before her. *See Kornecky v. Comm'r of Soc. Sec.,* 167 F.App'x 496, 508 (6th Cir. 2006) (citation omitted) At the same time:

> An ALJ may not selectively include only those portions of the medical evidence that places a claimant in a capable light, and fail to acknowledge evidence that potentially supports a finding of disability. Courts have not hesitated to remand under such circumstances. *See, e.g., Gentry* [*v. Comm'r of Soc. Sec.,* 741 F.3d 708, 724 (6th Cir. 2014)] (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany-Johnson* [*v. Comm'r of Soc. Sec.,* 313 F.App'x 771, 777 (6th Cir. 2008)] (finding error where the ALJ was "selective in parsing the various medical reports"); *see also Williams v. Colvin,* No. 1:16-cv-858, 2017 WL 1319781, at *16 (N.D Ohio Feb. 1, 2017), *report and recommendation adopted,* 2017 WL 1304475 (N.D. Ohio April 7, 2017); *Ackles v. Colvin,* No. 3:14-cv-249, 2015 WL 1757474 at *6 (S.D. Ohio April 17, 2015), *report and recommendation adopted,* 2015 WL 2142396 (S.D. Ohio May 6, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Taylor v. Comm'r of Soc. Sec.,* No. 4:13-cv-1253, 2014 WL 1874055, at *4 (N.D. Ohio May 8, 2014) (stating it "is clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record, or by selectively parsing that record—*i.e.,* 'cherry-picking' it—to avoid analyzing all the relevant evidence.).

23

*Davidson v. Berryhill*, No. 16-cv-2621, 2017 WL 4682343, at *17 (N.D. Ohio Oct. 18, 2017); *see also*

*Morris v. Sec'y of Health & Hum. Servs.*, 845 F.2d 326 (6th Cir. 1988) (table) (A reviewing court

"do[es] not require a written evaluation of every piece of testimony and evidence submitted.

However, a minimum level of articulation of the ALJ's assessment of the evidence is required in

cases in which considerable evidence is presented to counter the agency's position.").

### 1.  Attending and Completing Tasks

Ms. Welther takes issue with the ALJ's reliance on findings showing J.D.R.'s attention and

concentration were normal to find J.D.R. has a less than marked limitation in attending and

completing tasks. She claims the ALJ cherry-picked or "cho[se] only benign findings in a record of

significance." (ECF #10 at PageID 690). She emphasizes the ALJ did not address evidence from

herself, J.D.R.'s pediatrician, psychiatrist, counselors, teachers, and clinical social workers showing

his restlessness, distraction, poor self-control and impulsivity, poor focus, and defiant and

uncooperative behavior at home, at school, and in the community and contends that evidence

supports greater limitations in attending and completing tasks. (*Id.* at PageID 691-93).

In the domain of attending and completing tasks, the ALJ determined J.D.R. has less than

a marked limitation:

> This domain considers how well a child is able to focus and maintain attention, and
> how well he is able to begin, carry through, and finish activities, including the mental
> pace at which he performs activities and the ease of changing activities. Attending
> and completing tasks also refers to a child's ability to avoid impulsive thinking and
> his ability to prioritize competing tasks and manage his time (20 CFR 416.926a(h)
> and SSR 09-4p).
>
> Social Security rules provide that a school-age child without an impairment should
> be able to focus his attention in a variety of situations in order to follow directions,
> remember and organize school materials, and complete classroom and homework
> assignments. The child should be able to concentrate on details and not make
> careless mistakes in his work (beyond what would be expected in other children of
> the same age who do not have impairments). The child should be able to change

24

activities or routines without distraction and stay on task and in place when appropriate. The child should be able to sustain attention well enough to participate in group sports, read by himself, and complete family chores. The child should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation (20 CFR 416.926a(h)(2)(iv) and SSR 09-4p).

Social Security regulation 20 CFR 416.926a(h)(3) and SSR 09-4p set forth some examples of limited functioning in this domain that children of different ages might have. The examples do not apply to a child of a particular age; rather, they cover a range of ages and developmental periods. In addition, the examples do not necessarily describe "marked" or "extreme" limitation in the domain. Some examples of difficulty children could have in attending and completing tasks are: (i) is easily startled, distracted, or over-reactive to everyday sounds, sights, movements, or touch; (ii) is slow to focus on, or fails to complete, activities of interest (*e.g.*, games or art projects); (iii) repeatedly becomes side-tracked from activities or frequently interrupts others; (iv) is easily frustrated and gives up on tasks, including ones he is capable of completing; (v) requires extra supervision to remain engaged in an activity; or (vi) cannot plan, manage time, or organize self in order to complete assignments or chores.

The claimant's mother has reported the claimant has difficulty concentrating / focusing throughout the record. Testing has indicated he has clinically significant attention problems. The claimant's mother has reported to his doctors that he has poor academic performance because he takes longer to do things than his peers. The claimant is in occupational therapy to help with focus. With treatment he has been found to respond to redirection. Additionally, examiners have found the claimant's attention / concentration are age appropriate / normal / good at exams. The claimant has also been able to complete therapeutic activities at exams. Furthermore, he is able to do his homework. The claimant also enjoys playing on his tablet. He reportedly fixates on his video games. Furthermore, when he was younger, he enjoyed Thomas the Train and Mickey Mouse Clubhouse. Thus, the undersigned finds the claimant has less than marked limitation in attending and completing tasks based on the overall record.

(Tr. 22-23) (record citations omitted).

In this domain, the ALJ selectively parsed the record, placing J.D.R. in a more capable light without addressing considerable contrary evidence. The ALJ acknowledged test results showing significant attention problems and Ms. Welther's reports that J.D.R. has difficulty staying focused and works at a slower pace than his peers. (Tr. 23). The ALJ then determined J.D.R. has less than a

25

marked limitation in this domain because he can concentrate in one-on-one situations with medical providers during occupational therapy and medical appointments, can return to focus after he has been redirected, can complete his homework, can complete therapeutic activities during occupational therapy, and fixates on video games. (Tr. 23). But the ALJ did not address swaths of evidence suggesting J.D.R.'s limitation in this domain may be more severe. The ALJ did not mention any of the instances when J.D.R. was observed to be distracted, impulsive, defiant, disruptive, unfocused, or hyperactive in the home, at school, or in the community. (*See* Tr. 295, 318, 320, 352, 380, 388, 390, 417, 427-28). The ALJ did not discuss the Teacher Questionnaire identifying obvious daily problems with refocusing to task when necessary, changing from one activity to another without being disruptive, completing class and homework assignments, and working without distracting himself or others and slight daily problems in seven other activities relevant to the domain. (*See* Tr. 312). The ALJ also did not mention any of the CSW's CPST or TBS treatment notes reflecting interactions with J.D.R. at school and in his home showing he was distracting to others in class, needed redirection and reminders of rules while playing skill-building games, had poor self-control, and showed poor concentration and focus. (*See* Tr. 388, 390, 417, 427-28). Though the substantial evidence standard is a low bar and quite deferential, that deference requires "the ALJ must base the final determination on the record as a whole *and* must sufficiently explain his or her reasoning so a reviewing court can conduct a *meaningful* review." *See Cross o/b/o K.C. v. Comm'r of Soc. Sec.*, No. 5:20-cv-2787, 2022 WL 574260, at *5 (N.D. Ohio Feb. 25, 2022) (emphasis in original).

Without some explanation from the ALJ about the value of this evidence or why it was rejected, the Court cannot determine if "significant probative evidence was not credited or simply

ignored." *See Morris,* 845 F.2d at *3 (6th Cir. 1988); *see also Lowery v. Comm'r of Soc. Sec.,* 55 F.App'x 333, 339 (6th Cir. 2003) (An "ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning.") (citations omitted).

Moreover, the evidence the ALJ did rely on is evidence that, under the SSA's guidance for determining childhood disability, tends to show the child is more functionally limited, not less. For instance, the ALJ found J.D.R. is less limited in part because "with treatment, he has been found to respond to redirection." (Tr. 23). But a child's ability to pay attention well with frequent prompting is not evidence that the child is functioning well; rather, it "demonstrates the child is not paying attention as appropriately, effectively, or independently as children of the same age who do not have impairments." SSR 09-4p, 2009 WL 396033, at *2 (Feb. 18, 2009). The ALJ appears to have reached the opposite conclusion, listing that fact among others to support a less than marked limitation.

Similarly, the ALJ determined the evidence showing J.D.R. can "complete therapeutic activities" during occupational therapy sessions suggests he is less limited. (Tr. 23). This again seemingly contradicts agency guidance that evidence a child can complete activities with extra help or in a supportive setting tends to demonstrate the child is not as independent as same-age peers who do not have impairments. SSR 09-1p, 2009 WL 396033, at *6 ("In general, if a child needs a person, medication, treatment, device, or structured, supportive setting to make his functioning possible or to improve functioning, the child will not be as independent as same-age peers who do not have impairments. Such a child will have a limitation, even if he is functioning well with the help or support."). Finally, the ALJ found J.D.R. "also enjoys playing on his tablet" and "reportedly

27

fixates om his video games." (Tr. 23). SSA guidance cautions that some "children may exhibit 'hyperfocus,' an intense focus on things that interest them, such as video games, but be limited in their ability to focus on other tasks" and this ability is not necessarily suggestive of the child's ability to focus on other tasks and settings. SSR 09-4p, 2009 WL 396033, at *3. Though the ALJ cites SSR 09-4p's general guidance for the domain, the ALJ does not discuss these particular issues, instead listing each fact among others as self-evidently supporting a less than marked limitation without explanation of why. (*See* Tr. 22-23). Though "the conclusion of the ALJ may be justified," the failure to follow agency rules and regulations "denotes a lack of substantial evidence." *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009). The ALJ's apparent weighing of the evidence to reach multiple conclusions the SSA's guidance cautions against suggests the ALJ did not correctly apply the SSA's own rules and regulations and so the reasons the ALJ did provide would lack substantial evidence.

Taking the lack of explanation of these seeming contradictions together with the ALJ's failure to address a significant body of contrary evidence, I conclude the Court cannot meaningfully review the ALJ's findings in this domain. *See Cross*, 2022 WL 574260, at *5.

### 2.      Caring for Oneself

Ms. Welther takes issue with the ALJ's failure to address J.D.R.'s toileting problem when finding J.D.R. had a less than marked limitation in caring for himself. (ECF #10 at PageID 693). Ms. Welther also argues the ALJ did not explicitly address her own testimony that J.D.R. is not independent in most of his day-to-day activities because he has significant tantrums, needs to be supervised when bathing and grooming, and needs frequent prompting to pick up his toys or help around the house. (*Id.* at PageID 693-95).

28

In the domain of "caring for oneself," the ALJ determined J.D.R. has less than a marked limitation:

> This domain considers how well a child maintains a healthy emotional and physical state, including how well a child satisfies his physical and emotional wants and needs in appropriate ways. This includes how the child copes with stress and changes in the environment and how well the child takes care of his own health, possessions, and living area (20 CFR 416.926a(k) and SSR 09-7p).
>
> Social Security rules provide that a school-age child without an impairment should be independent in most day-to-day activities (e.g., dressing and bathing), although he may still need to be reminded sometimes to do these routinely. The child should begin to recognize that he is competent in doing some activities but has difficulty doing others. The child should be able to identify those circumstances when he feels good about himself and when he feels bad. The child should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. The child should also begin to demonstrate consistent control over his behavior, and be able to avoid behaviors that are unsafe or otherwise not good for him. At this age, the child should begin imitating more of the behavior of adults he knows (20 CFR 416.926a(k)(2)(iv) and SSR 09-7p).
>
> Social Security regulation 20 CFR 416.926a(k)(3) and SSR 09-7p set forth some examples of limited functioning in this domain that children of different ages might have. The examples do not apply to a child of a particular age; rather, they cover a range of ages and developmental periods. In addition, the examples do not necessarily describe "marked" or "extreme" limitation in the domain. Some examples of difficulty children could have in caring for themselves are: (i) continues to place non-nutritive or inedible objects in the mouth (*e.g.*, dirt, chalk); (ii) often uses self-soothing activities that are developmentally regressive (*e.g.*, thumb-sucking or re-chewing food); (iii) does not feed, dress, toilet, or bathe self age-appropriately; (iv) engages in self-injurious behavior (*e.g.*, suicidal thoughts or actions, self-inflicted injury, or refusal to take medication), or ignores safety rules; (v) does not spontaneously pursue enjoyable activities or interests (*e.g.*, listening to music, reading a book); (vi) has restrictive or stereotyped mannerisms (*e.g.*, head banging, body rocking); or (vii) has disturbances in eating or sleeping patterns.
>
> He has clinically significant conduct problems. He has poor self-control. When he gets angry, he punches or scratches himself in the face. However, as discussed above he has been in treatment to improve his coping skills. He has been able to express his feelings to examiners. He has also exhibited normal / appropriate / unremarkable behavior at exams. He understands right from wrong. He has developed fair / good insight and judgment. The record further reveals that he has attended occupational therapy to improve ability to perform activities of daily living. Examiners have

> observed the claimant to be well groomed at exams. He also eats 1-3 meals a day and gets 10 hours of a sleep a night. Finally, he enjoys drawing, coloring, watching television, and playing video games. Based on all the foregoing and the record overall the undersigned finds the claimant has less than marked limitation in the ability to care for himself.

(Tr. 25-26) (record citations omitted).

Ms. Welther asserts the ALJ did not address J.D.R.'s toileting problems in this domain. (ECF #10 at PageID 693). By regulation, the ALJ must evaluate a child's impairment-related limitations in any affected domain. 20 C.F.R. § 416.926a(c). The ALJ found enuresis and encopresis collectively were a severe impairment. (Tr. 18). The ALJ also discussed the extent of J.D.R.'s toileting issues before analyzing the domains. (Tr. 21). The ALJ acknowledged that SSA guidance uses a child's failure to use the toilet in an age-appropriate manner as an example of the difficulty a child may have in caring for himself. (Tr. 25; *see also* SSR 09-7p, 2009 WL 396029, at *6, (Feb. 17, 2009). But the ALJ did not mention J.D.R.'s difficulty with toileting for this domain. The Commissioner correctly points out the ALJ's decision must be read as a whole and the court must look to the ALJ's earlier findings. (ECF #13 at PageID 709). But the earlier findings suggest J.D.R. may not use the toilet in an age-appropriate manner, though there is conflicting evidence. Contrary to the Commissioner's assertion, the ALJ did not carry this over "in evaluating J.D.R.'s ability to care for himself." (*Id.*). Rather, the ALJ left the issue open and gave no indication as to the weight of that evidence in analyzing this domain, despite SSR 09-7p's use of the issue as an example. Without some explanation from the ALJ about the value of this evidence or why it was rejected, the Court cannot determine if "significant probative evidence was not credited or simply ignored." *See Morris*, 845 F.2d at *3 (6th Cir. 1988).

30

Ms. Welther also argues the ALJ did not explicitly address her own testimony that J.D.R. is not independent in most of his day-to-day activities because he has significant tantrums, needs to be supervised when bathing and grooming, and needs frequent prompting to pick up his toys or help around the house. (ECF #10 at PageID 693-95). Like the ALJ's evaluation in the domain of attending and completing tasks, the ALJ did not address all relevant evidence and drew conclusions not supported by the evidence she did consider.

First, the record is replete with evidence of J.D.R.'s persistent difficulties in maintaining a healthy emotional state at home, including:

- Throwing tantrums and becoming physically aggressive;
- Becoming angry when prompted to do chores;
- Threatening to harm himself and his sister when he is angry;
- Refusing to speak to his mother when he is mad at her; and,
- Having accidents during the day because he cannot pull himself away from what he is doing or playing.

(*See, e.g.,* Tr. 236, 320, 346, 380, 396, 441). The ALJ acknowledges J.D.R.'s past self-harm when upset, but none of the other difficulties that have persisted despite treatment. (*See* Tr. 26) (citing Tr. 320). Without some explanation from the ALJ, the Court cannot determine if the "evidence was not credited or simply ignored." *See Morris,* 845 F.2d at *3 (6th Cir. 1988).

Moreover, the ALJ did not explain the conclusions she drew from the cited evidence when those conclusions seem to contradict SSA guidance. The ALJ highlighted J.D.R.'s participation in treatment to improve his coping skills and his ability to perform activities of daily living in occupational therapy. (Tr. 26). But, as addressed above, under the SSA's whole-child approach, evidence that J.D.R.'s functioning is improved while in a supportive setting does not suggest he is less limited but that "the child will not be as independent as same-age peers who do not have impairments." SSR 09-1p, 2009 WL 396031, at *6-7. The ALJ did not address this apparent

31

conflict in reasoning. The ALJ also emphasized that J.D.R. was "well-groomed" at examinations (*see* Tr. 23), but the ALJ did not mention any evidence from Ms. Welther that J.D.R. needs prompting and supervision to shower effectively, comb his hair, brush his teeth, and get dressed such that he is less independent than his same-aged peers. (Tr. 298, 320, 457). When viewed together, J.D.R. may be well-groomed when examined, but that may simply be the product of Ms. Welther's prompting, not his ability to maintain hygiene independently. This contextual hole suggests the ALJ did not review the record as a whole. *See Brooks,* 531 F.App'x at 641 ("the substantiality of evidence must take into account whatever in the record fairly detracts from its weight"). Considering the lack of weighing J.D.R.'s toileting issues, the failure to address a significant body of contrary evidence, the inference that seemingly contradicts SSA policy, and the analysis of evidence without context, the Court cannot meaningfully review the ALJ's findings in this domain. *See Cross,* 2022 WL 574260, at *5.

The Commissioner contends the ALJ considered the factors and explained how the objective medical evidence and opinion evidence supported finding less than marked limitations in the challenged domains. (ECF #13 at PageID 705-09). But for the reasons I have discussed, the Court cannot meaningfully review the ALJ's conclusions for substantial evidence. I thus recommend the District Court remand the matter so the ALJ may review the record as a whole and explain why the evidence weighs towards or against disability.

## II. Ms. Welther has not shown the ALJ erred in evaluating her statements about the intensity, persistence, and limiting effects of J.D.R.'s symptoms.

Alongside the cherry-picking argument, Ms. Welther argues the ALJ did not properly evaluate the statements she made about the severity of J.D.R.'s impairments, contending the ALJ accepted her statement that J.D.R. can do homework but erred in rejecting without explanation

her qualifying comment that J.D.R. works at a slower pace than his peers. (ECF #10 at PageID 691). The Commissioner responds that the ALJ appropriately "considered conflicting evidence in the record and [Ms. Welther's] testimony and reasonably concluded that [Ms. Welther's] subjective allegations regarding J.D.R.'s ability to attend and complete tasks was inconsistent with the evidence." (ECF #13 at PageID 707).

In evaluating whether a child's impairments functionally equal the listings, the ALJ must consider the claimant's statements about the intensity, persistence, and limiting effects of his symptoms. Evaluating an individual's subjective symptoms is a two-step process. *See* SSR 16-3p, 2017 WL 5180304, at *3 (Mar. 24, 2016). First, the ALJ must consider whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.*

At the second step, the ALJ may consider evidence directly from the claimant or gleaned from other medical and non-medical sources. *Id.* Non-medical sources may include "public and private agencies, other practitioners, education personnel, non-medical sources such as family and friends, and agency personnel." *Id.* at *7. When a child with a disability claim cannot adequately describe his symptoms, the ALJ accepts a description of symptoms from the person most familiar with the child, such as a parent. *Id.* at *6. In evaluating the limiting effects of the claimant's symptoms, the ALJ must consider all evidence in the record including: daily activities; the location, duration, and frequency of the alleged symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of medication; treatment other than

medication; other efforts made to alleviate the symptoms; and other factors regarding the claimant's functional limitations. 20 C.F.R. § 416.929(c)(3). Based on the evidence, the ALJ determines the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR 16-3p, 2017 WL 5180304, at *2. If a claimant's various statements about the intensity, persistence, and limiting effects of symptoms are consistent with one another and consistent with the objective medical evidence and other evidence in the record, the ALJ will determine that the claimant's symptoms are more likely to reduce the abilities to function independently, appropriately, and effectively in an age-appropriate manner. *Id.* at *8-9.

An ALJ need not accept a claimant's subjective complaints as true. *Jones*, 336 F.3d at 476. An ALJ also need not "make explicit credibility findings as to each bit of conflicting testimony, so long as [the] factual findings as a whole show that [the ALJ] implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F.App'x 496, 508 (6th Cir. 2006). But the explanation must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007); *see also* SSR 16-3p, 2017 WL 5180304, at *10. "Blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence." *Rogers*, 486 F.3d at 248.

In the domain of attending and completing tasks, the ALJ noted Ms. Welther's statement that J.D.R. does homework but is slower to complete his work compared to his classmates. Contrary to the parties' arguments, these statements do not appear inconsistent with one another.

Indeed, the ALJ seems to have accepted both statements and found the evidence did not rise to a marked or extreme limitation. Ms. Welther has not identified an error here.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying supplemental security income and **REMAND** for additional proceedings consistent with this recommendation.

Dated: May 28, 2026

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection to the entirety of the magistrate's report has the same effects as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at \*2 (W.D. Ky. June 15,**

35

2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).